**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **DEVIN BRADLEY LEATHERWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:25-cv-1085-STA-jay** |
| | ) | |
| **SAMUEL GROOMS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 27)
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 30)**

Before the Court is Plaintiff Devin Bradley Leatherwood's Motion for Partial Summary Judgment (ECF No. 27), and Defendant Samuel Groom's Motion for Summary Judgment (ECF No. 30). The parties have fully briefed both Motions, including the submission of supplemental briefing addressed to a recent *en banc* decision from the Court of Appeals. For the reasons set forth below, both Motions are **DENIED**.

## BACKGROUND

At midnight on March 29, 2024, Defendant Samuel Grooms, an officer with the Adamsville Police Department, initiated a traffic stop when he observed a vehicle exceeding the speed limit (42 mph in a 30 mph zone). Plaintiff Devin Bradley Leatherwood was driving the vehicle. After a short investigation, Defendant determined that Plaintiff was driving under the influence and placed him under arrest. Plaintiff had just been in an accident, though the exact nature of the accident is not clear from the record. What is clear is that Plaintiff had suffered

broken bones in his wrist and hand as a result of the accident. So when Defendant put Plaintiff in handcuffs, Plaintiff began to complain that the handcuffs were too tight. By the time Defendant had transported Plaintiff to jail and started the booking process, Plaintiff's wrist had begun to swell. Plaintiff alleges that Defendant violated his constitutional rights, both by using excessive force with the handcuffs and by denying Plaintiff needed medical treatment at the time he was booked into the jail. Plaintiff seeks to hold Defendant liable under 42 U.S.C. § 1983 for the violation of Plaintiff's rights as well as for the torts of assault and battery. Plaintiff now seeks judgment as a matter of law on the issue of Defendant's liability, and Defendant on his defense of qualified immunity.

## I. Factual Background

To decide the parties' Rule 56 Motions, the Court must first consider whether any genuine issue of material fact exists that might preclude judgment as a matter of law. A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the record and show that the evidence fails to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). In support of each Motion, the parties have filed their own statements of undisputed facts.

Each side has responded to the other side's statement of facts. The evidence at summary judgment consists of the parties' deposition testimony about what happened during and immediately following the arrest.

The parties have also submitted video of the arrest captured by Defendant's body cam. At summary judgment, a court must view the facts in a light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). Video evidence which "blatantly contradicts" one party's version of events can mean an apparent factual dispute over what happened is not actually "genuine." *Nash v. Bryce*, 157 F.4th 436, 453 (6th Cir. 2025) (citing *Scott*, 550 U.S. at 380) (cleaned up). In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* (quoting *Scott*, 550 U.S. at 380)).

Practically speaking, a district court should not grant summary judgment "based on its own interpretation of what the video shows" when a reasonable jury could reach more than one conclusion about the proof, for example, whether the video shows a person resisting arrest. *Id*. at 454 (citing *Coble v. City of White House*, 634 F.3d 865, 868 (6th Cir. 2011)). The key inquiry for a court is whether a video so "blatantly contradicts" the non-moving party's version of events "no reasonable jury could believe" the non-moving party's testimony. *Id.* (quoting *Scott*, 550 U.S. at 380). In the absence of a "blatant contradiction," a court should "view any relevant gaps or uncertainties left by the videos in the light most favorable to" the nonmoving party. *Id*. at 453 (citing *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022)). Here, both sides largely agree on what the video shows. Therefore, the Court finds that the following facts shown in the body cam footage along with the other proof cited by the parties is material and undisputed

for purposes of summary judgment, unless otherwise noted.

On March 29, 2024, at approximately 12:00 a.m., Defendant Officer Samuel Grooms stopped Plaintiff Devin Leatherwood in Adamsville, Tennessee, for driving forty-two (42) miles per hour in a 30-mph speed zone. (Def.'s SOF ¶ 1; Pl.'s SOF ¶ 8.) At the time of the stop, Officer Grooms activated his body-worn camera, which accurately captured his interaction with Leatherwood. (*Id.* ¶ 9; Def.'s SOF ¶ 2.) Immediately upon approaching Leatherwood's vehicle, Officer Grooms noticed a bleeding wound on Mr. Leatherwood's head, an injury to his eye, and blood on his leg. (Pl.'s SOF ¶ 10.)

After Officer Grooms noticed the cut above Leatherwood's eye, he asked, "You alright?" to which Leatherwood responded, "Yeah, I'm good, I'm trying to find my license." (Def.'s SOF ¶ 3; Video at 00:00:45-00:00:50.) After Grooms pointed out that the place on Leatherwood's forehead was bleeding, Leatherwood responded, "yeah." (*Id.* ¶ 4; Video at 00:00:52-00:00:55.) When Grooms saw blood on Leatherwood's knee, he asked, "Are you sure you are alright?" to which Leatherwood replied, "Yeah, I'm good, I just fell man." (*Id.* ¶ 5; Video at 00:01:04-00:01:11 and 00:01:40-00:01:46.) Grooms asked, "What's going on? Are you sure you are alright?" (*Id.*) Leatherwood responded, "Yeah, I'm good bro." (*Id.*) Leatherwood, told Grooms he fell at McNairy Central when he "was over here f---ing with my brother." (*Id.* ¶ 6; Video at 00:05:57-00:06:01.) When Grooms asked Leatherwood if he had been in a fight, Leatherwood replied that he had fallen. (Pl.'s SOF ¶ 11.)

A short time after the stop began, a second car pulled up behind Leatherwood's vehicle. (*Id.* ¶ 12.) The driver of the second car independently corroborated that Leatherwood had fallen. (*Id.*) Officer Grooms still did not believe that Leatherwood had fallen but rather that he had been in an altercation. (*Id.*) Officer Grooms instructed Leatherwood and his passenger to exit the

vehicle. (*Id.* ¶ 13.) Officer Grooms then patted down both Leatherwood and the passenger and proceeded to search the vehicle. (*Id.*)

Officer Grooms did not find any weapons, drugs, alcohol, or alcohol refuse in the vehicle. (*Id.* ¶ 14.) Furthermore, at no time during the stop or investigation was Leatherwood noncompliant or physically threatening, nor did he make any threats toward Officer Grooms or attempt to evade him. (*Id.* ¶ 15.) Although Leatherwood was "verbally upset," Officer Grooms testified that it was not unusual during a traffic stop and did not change the rights afforded to Leatherwood. (*Id.* ¶ 16.)[1]

After investigating, Officer Grooms made the decision to arrest Leatherwood on suspicion of driving under the influence (DUI) and a violation of the implied consent law, charges that were ultimately dismissed. (*Id.* ¶ 17.) Leatherwood was handcuffed from the time of his arrest until he entered the McNairy County Jail, a total of approximately forty-six (46) minutes. (*Id.* ¶ 18.) When Grooms handcuffed Leatherwood, Leatherwood did not complain about his wrist. (*Id.* ¶ 7.) Grooms got Leatherwood out of the patrol SUV, and he removed the handcuffs so Leatherwood could perform the field sobriety test. (*Id.* ¶ 8; Video at 00:12:02-00:12:30.)

Four minutes later after completing the field sobriety test, Officer Grooms handcuffed Leatherwood and put him back in the SUV. (*Id.* ¶ 9; Video at 00:16:59-00:17:40.) A little over 11 minutes later, Leatherwood asked if Officer Grooms could "loosen these cuffs up." (*Id.* ¶ 10; Video at 00:28:58-00:29:09.) Officer Grooms responded, "Okay, I will take a look at them after everything, okay?" (*Id.*) Although nothing prevented Officer Grooms from responding to

---

[1] Plaintiff also asserts that once he was formally under arrest, he did not say anything offensive or derogatory to Officer Grooms. (Pl.'s SOF ¶ 16.) Defendant objects that the evidence cited does not actually support this fact claim. Officer Grooms has also furnished an affidavit in which he states that when he informed Leatherwood he was under arrest, Leatherwood responded, "I don't give a f—k what you do." (Grooms Decl. ¶ 26.)

Leatherwood's plea and checking the tightness of the handcuffs at the time of the request, Officer Grooms failed to do so either before or after completing the paperwork for Leatherwood's arrest. (Pl.'s SOF ¶ 21.) Officer Grooms failed to follow his handcuffing training despite the fact that he knew Leatherwood had suffered apparent injuries related to a recent fall and despite knowing that excessively tight handcuffs can cause physical injury. (*Id.* ¶ 22.)

After ten minutes more passed, Leatherwood said, "Loosen my handcuffs up." (Def.'s SOF ¶ 11; Video at 00:39:17-00:39:25.) Officer Grooms responded, "Not right now." (*Id.*) Leatherwood then says, "I mean, I just fell, you know, so now I'm hurtin." (*Id.*)

Before leaving for the jail, Grooms engaged in a number of other tasks: he talked to Leatherwood's aunt, explained the charges to Leatherwood's mother, completed paperwork, searched Leatherwood's car, dealt with the passenger in Leatherwood's car (who had managed to move his cuffed hands from behind him to in front of him and disobeyed the command to get back in the SUV), spoke with the wrecker driver, and moved his patrol unit across the road. (*Id.* ¶ 12; Video at 00:43:22-00:43:46 and 00:43:50-00:44:14.)

Leatherwood does not dispute that Officer Grooms was engaged in various tasks at the scene of the traffic stop and arrest. However, Leatherwood denies that any of the tasks prevented Officer Grooms from checking Leatherwood's handcuffs. It is undisputed that Officer Grooms talking to Leatherwood's mother did not prevent Officer Grooms from checking Leatherwood's handcuffs and determining if they needed to be loosened to prevent pain and/or injury. (Pl.'s SOF ¶ 28.) It is further undisputed Officer Grooms could have stopped the vehicle during the transport to the McNairy County Jail to check Leatherwood's handcuffs as he was trained to do but did not do so. (*Id.* ¶ 29.)

Leatherwood made his next complaint about the handcuffs almost twelve minutes later on

the ride to the jail. Leatherwood said, "You got to loosen up my cuffs, bro. This sh-t hurts." (Def.'s SOF ¶ 13. Video at 00:51:00-00:51:34.) Officer Grooms responded, "I was gonna check'em and then I had to talk to your momma." (*Id.*) Grooms claims he was distracted and forgot to check the handcuffs. (*Id.* ¶ 14.) A genuine dispute of material fact exists over whether Officer Grooms turned the volume up on his car radio after Leatherwood made his third request to check the handcuffs.

Leatherwood asserts that he asked Officer Grooms to check the handcuffs three different times and that nothing prevented Officer Grooms from checking the handcuffs at any point before arriving at the McNairy County Jail. After approximately forty-six (46) minutes, Officer Grooms removed the handcuffs from Leatherwood's wrists upon arrival at the McNairy County Jail. (Pl.'s SOF ¶ 30.) Once the handcuffs were removed, Leatherwood extended his wrists, which revealed obvious swelling in his left wrist, though a genuine dispute exists over whether the handcuffs had left marks on Leatherwood's wrists. (*Id.* ¶ 31; Video 00:46:00-00:46:22). Both Officer Grooms and McNairy County Deputy Rachel Devine noticed Leatherwood's swollen wrist. (*Id.* ¶ 32.) Deputy Devine verbalized that Leatherwood's wrist was "swollen up." (*Id.*)

At the jail, while Officer Grooms was still present, Leatherwood did not ask anyone to take him to the hospital. (Def.'s SOF ¶ 15.) Rather, Leatherwood said, "I'm fixing to have to go to the hospital. This sh-t hurts. My wrist broke–gotta be fractured or something… I'm fixin' to have to go to the hospital… I knew it was… I'm gonna have to go to the hospital." (*Id.*; Video at 1:03:26.) Officer Grooms admits for purposes of summary judgment that he did not call EMS, despite having the exclusive authority to do so. (Pl.'s SOF ¶ 33.) Leatherwood was still in Officer Grooms's sole custody, not the custody of the McNairy County Jail, at the time his handcuffs were removed and when he stated that he needed to go to the hospital because he thought his arm

was broken. (*Id.* ¶ 34.) Officer Grooms filled out the necessary paperwork to commit Leatherwood to the custody of the McNairy County Jail without requesting or providing any medical assessment for Leatherwood's injuries. (*Id.* ¶ 35.)

In the afternoon of March 29, 2024, Mr. Leatherwood was furloughed from the McNairy County Jail. (*Id.* ¶ 36.)[2] Leatherwood sought emergency medical treatment at the Hardin Medical Center, where he received an x-ray of the left forearm. (*Id.*) The x-ray confirmed an acute fracture of the left ulnar styloid. (*Id.*) A follow-up CT scan of the left upper extremities performed at Hardin Medical Center revealed that Leatherwood had ulnar styloid avulsion fractures; a triquetral fracture; and a complete scaphoid fracture, which required surgery. (*Id.* ¶ 37.) The ulnar styloid is the bone on the pinky side of the wrist; the triquetral bone is the carpal bone at the end of the pinky finger with a ligament that attaches to the wrist; and the scaphoid is on the thumb side of the wrist. (*Id.* ¶ 38.) As a result of his need for a higher level of care, Leatherwood was referred to West Tennessee Bone and Joint Institute. (*Id.* ¶ 39.) Leatherwood's treating surgeon, Dr. Michael Dolan, opined that handcuffing wrist fractures, such as Mr. Leatherwood's, would certainly cause significant pain. (*Id.* ¶ 40, 41.)

At the time of Leatherwood's arrest, Officer Grooms was a seasoned police officer with significant experience on patrol. (*Id.* ¶ 1.) Grooms had prior experience in patrol with the McNairy County Sheriff's Office, Jackson State Community College Police, Wayne County Sheriff's Office, and the Panama City (Fla.) Police Department. (*Id.* ¶ 2.) As part of his training, Grooms learned how to conduct traffic stops, how to recognize and respond to potential medical needs of arrestees, and how to properly handcuff them. (*Id.* ¶ 3.) Specifically, Grooms was trained that if

---

[2] Defendant admits each of the facts asserted about Plaintiff's medical diagnosis and treatment. Defendant asserts though that the facts are not material.

an arrestee complained of pain from handcuffs, he was to check them to make sure he could fit a finger between the handcuff and the individual's wrist and loosen them if they were too tight. (*Id.* ¶ 4.) The purpose of checking handcuffs for tightness is to ensure that the handcuffs are not causing unnecessary injury or pain. (*Id.* ¶ 5.)

Officer Grooms was also trained that, if there was concern an arrestee had a potential medical issue, he was to call for emergency medical services ("EMS") to assess the individual or take them to a medical provider for an assessment. (*Id.* ¶ 6.) Grooms knew the purpose of the training to seek a medical assessment was to catch a medical problem before it worsened, and to ensure the individual was taken to the hospital instead of jail if medical care or treatment was necessary. (*Id.* ¶ 7.)

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court does not engage in "jury functions" like "credibility determinations and weighing the evidence." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citing *Anderson*, 477 U.S. at 255). Rather, the question for the Court is whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.

*Anderson*, 477 U.S. at 252. The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Nevertheless, "the standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020). When the party moving for summary judgment bears the burden of proof at trial, the party's "initial summary judgment burden is higher in that [the moving party] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488–89 (6th Cir. 2024) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (quotations omitted)). In other words, the moving party must show "that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also* 11 James William Moore, et al., *Moore's Federal Practice* § 56.40(1)(c) (3d ed. 2010) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence.").

## ANALYSIS

Plaintiff seeks to hold Defendant liable for the violation of his constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff now moves for judgment as a matter of law on the issue

of Defendant's liability for the violation of Plaintiff rights. Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. "Section 1983 is not the source of any substantive right," *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001), but creates a "species of tort liability" for the violation of rights guaranteed in the Constitution itself. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 362 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). In order to make out a § 1983 claim, a plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

Defendant argues that he is entitled to qualified immunity on Plaintiff's § 1983 claims. "Qualified immunity shields government officials from liability if their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smith v. Kind*, 146 S.Ct. 2346, 2349 (2026) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). "To overcome the bar of qualified immunity, plaintiffs must show that defendants (1) violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time of the challenged conduct." *Bailey v. Michigan Dept. of Corrs.*, --- F.4th ---, 2026 WL 3083727, at *3 (6th Cir. Oct. 15, 2026) (citing *Guertin v. Mich.*, 912 F.3d 907, 917 (6th Cir. 2019)).

Defendant seeks summary judgment on the issue of his qualified immunity from suit on each of Plaintiff's § 1983 claims. On the handcuffing claim, Defendant argues that he is entitled to qualified immunity because Plaintiff cannot make out each of the elements of the constitutional violation itself. On the claim for failure to provide medical treatment, Defendant argues that

qualified immunity is appropriate because Plaintiff cannot prove a constitutional violation and the right claimed by Plaintiff was not clearly established. The Court will consider each argument as part of its analysis of the separate constitutional claims.

Before reaching the merits of the issues, the Court must initially decide which legal standard governs each of the distinct types of constitutional violations alleged by Plaintiff. Under § 1983, the Court's "threshold inquiry" is "to identify the specific constitutional right" at issue and then apply the relevant elements and rules of an action to vindicate the right. *Manuel*, 580 U.S. at 370 (quoting *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (plurality opinion)). Plaintiff's claims implicate two different legal standards, one for handcuffing and the other for the denial of medical treatment. The Court will discuss the law and evidence for each claim separately.

## I. <u>Fourth Amendment Excessive Force - Handcuffing</u>

Plaintiff first alleges that Defendant violated his constitutional rights by applying handcuffs too tightly. "The Fourth Amendment guarantees the right to be free from excessive force to persons who are stopped, arrested, or held in custody by an arresting officer." *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). The United States Court of Appeals for the Sixth Circuit has adopted a three-factor test to determine whether "unduly tight or excessively forceful handcuffing" rises to the level of a Fourth Amendment violation as excessive force. *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009).

To carry his burden of proof at the summary-judgment stage, a plaintiff must show the following elements: "(1) [the plaintiff] complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Id.* The Court of Appeals has described the test for handcuffing as "a subset of

the general Fourth Amendment excessive-force framework." *Hughey*, 3 F.4th at 289 (citing *Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997)). Where as is the case here a plaintiff's sole allegation of excessive force is that the cuffs around their wrists were too tight, courts apply the three-part handcuffing test and terminate the Fourth Amendment analysis there. *Id.*

The Court holds that genuine disputes of material fact remain over Plaintiff's claim for excessive force based on the tightness of the handcuffs, meaning neither side is entitled to judgment as a matter of law on the claim. First, there is no genuine dispute about the first element. Plaintiff has shown, and Defendant does not contest the point, that Plaintiff made several complaints about the tightness of the handcuffs. Plaintiff has thus carried his burden of proof as to the first element of the handcuffing test.

A genuine dispute of material fact exists, however, over whether Defendant ignored Plaintiff's complaints about the handcuffs. Plaintiff has shown that he raised three different complaints about the discomfort and pain the handcuffs were creating in his wrists over a 46-minute timespan. While the proof shows that Defendant verbally acknowledged Plaintiff's complaints as Plaintiff made them, Defendant never stopped to check the handcuffs for tightness or made any adjustment to the fit of the handcuffs. Defendant argues that he was merely distracted and forgot to check the handcuffs. Be that as it may, it is undisputed Defendant did not check the handcuffs at the time of the complaints or even close in time to the complaints.

The reasons for Defendant's failure to check the handcuffs presents a jury question. A reasonable juror could credit Defendant's explanation for his failure to take prompt action in response to Plaintiff's complaint, specifically, that Defendant was distracted by the other matters to which he had to attend as part of Plaintiff's arrest. Viewing the evidence in a light most favorable to Defendant, as the Court must when deciding Plaintiff's Rule 56 Motion on the claim,

a reasonable juror could find in Defendant's favor on the handcuffing claim.

By the same token, a reasonable juror could find that Defendant ignored Plaintiff's pleas to have the handcuffs loosened. The second element of Plaintiff's handcuffing claim then boils down to the credibility of Defendant's testimony. As a result, a genuine dispute exists on this factor, which the Court cannot resolve as a matter of law in favor of either party. *Baynes*, 799 F.3d at 609 (holding that the credibility of the officer and his response to a complaint about handcuffing presented a jury question). This dispute alone means each side's Rule 56 Motion must be denied on the Fourth Amendment handcuffing claim.

The Court further finds that a genuine dispute of material fact exists over the third element of Plaintiff's handcuffing claim, whether the handcuffing caused a physical injury. "[S]atisfying the injury prong is not demanding" in the context of a Fourth Amendment excessive force claim based on handcuffing. *Hughey*, 3 F.4th at 290. The Sixth Circuit has held that different kinds of injuries might suffice to meet this element. For example, "bruising, skin marks, and attendant pain allegedly suffered by [an arrestee] during the forty to fifty minutes she was handcuffed" will do. *Morrison*, 583 F.3d at 403. So does "numbness and swelling" while wearing handcuffs for around 35 minutes. *Martin v. Heideman*, 106 F.3d 1308, 1310 (6th Cir. 1997). As these cases illustrate, the Court of Appeals usually considers the injury question in conjunction with the amount of time the arrestee remained in handcuffs.

Here, there is proof from which a reasonable jury could find that Plaintiff suffered from a combination of pain and swelling. Defendant admits Plaintiff's wrist was visibly swollen when Defendant finally removed the handcuffs. Defendant also admits Plaintiff had the handcuffs on for over 45 minutes and repeatedly complained about the pain he was suffering. This is enough to survive summary judgment and send the issue to a jury.

Defendant seems to misapprehend the nature of the injury alleged by Plaintiff. Defendant argues that there is no evidence the handcuffing caused the serious physical injuries to Plaintiff's hand and wrist. Plaintiff concedes that he had previously sustained fractures to bones in his hand and wrist a short time before Defendant ever put Plaintiff in handcuffs. But Plaintiff does not allege that the handcuffing caused the fractures he suffered. Plaintiff posits the handcuffing exacerbated the swelling and physical pain he experienced because of the fractures. Plaintiff has also introduced medical opinion evidence from his treating physician to show that overly tightened handcuffing would have caused more swelling and pain to the area of Plaintiff's fractured bones. Based on this proof, a reasonable jury could find in Plaintiff's favor on the injury-prong of Plaintiff's claim. Defendant's point does not show then why Plaintiff's injuries do not present a jury question.

For the same reasons that triable issues remain over Plaintiff's Fourth Amendment claim for handcuffing, the Court holds that Defendant is not entitled to qualified immunity. There is no dispute that Plaintiff's right to be free from excessive force based on the application of the handcuffs was clearly established. *King v. City of Lincoln Park, Mich.*, No. 24-2017, 2025 WL 2218857, at *3 (6th Cir. Aug. 5, 2025) (collecting cases). Defendant just argues that Plaintiff cannot prove that Defendant violated his constitutional rights. Because genuine disputes of material fact remain over whether Plaintiff suffered a violation of his Fourth Amendment rights, Defendant is not entitled to qualified immunity on this claim.

Therefore, Plaintiff's Motion for Partial Summary Judgment on the question of liability is **DENIED** as to his Fourth Amendment handcuffing claim. Likewise, Defendant's Motion for Summary Judgment is **DENIED** on this claim.

## II. Deliberate Indifference to a Serious Medical Need

Defendant also moves for judgment as a matter of law on Plaintiff's Fourteenth Amendment claim for deliberate indifference to a serious medical need. Under the Fourteenth Amendment, persons detained by law enforcement "have an established right to medical care 'that is analogous to the right of prisoners under the Eighth Amendment.'" *Hodges v. Abram*, 138 F.4th 980, 987 (6th Cir. 2025) (quoting *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)). "An officer violates that right if they show 'deliberate indifference to a pretrial detainee's serious medical needs.'" *Id.* (quoting *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022)) (alterations in original).

**A. Deliberate Indifference to Plaintiff's Serious Medical Needs**

The Court of Appeals recently announced a change in the law applicable to Plaintiff's deliberate indifference claim. At the time of Plaintiff's alleged injury, the law in the Sixth Circuit required a pretrial detainee to satisfy two elements for a Fourteenth Amendment claim based on deliberate indifference to a serious medical need: (1) he "had a sufficiently serious medical need and (2) that [the] defendant acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (internal quotation marks omitted)). To establish the second element, a pretrial detainee alleging deliberate indifference to his serious medical needs had to "prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Brawner*, 14 F.4th at 596 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

The Sixth Circuit's *Brawner* decision in 2021 (and a series of cases that followed *Brawner*) itself represented a change in the law on the deliberate indifference standard, all arising

out of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Prior to *Brawner*, this Circuit followed the Supreme Court's holding in *Farmer v. Brennan*, 511 U.S. 825 (1994) and required a pretrial detainee to show "two components, one objective and the other subjective." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). *Farmer*'s objective component required a plaintiff to prove the existence of a "sufficiently serious" medical need. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (citing *Farmer*, 511 U.S. at 834). *Brawner* did not alter that showing.

But *Brawner* did alter *Farmer*'s subjective element. The subjective component under *Farmer* put the burden on the plaintiff to adduce facts showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* (citing *Farmer*, 511 U.S. at 837). "*Brawner* 'modified' *Farmer*'s subjective prong to incorporate a reasonable officer standard in the context of a claim for deliberate indifference to serious medical needs." *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022) (citing *Brawner*, 14 F.4th at 592) (other citation omitted).

After the parties had briefed the issues in Defendant's Motion for Summary Judgment, the Sixth Circuit sitting *en banc* abrogated *Brawner* and its progeny. Reverting back to the pre-*Brawner* standard for deliberate indifference to a pretrial detainee's serious medical needs, the Court of Appeals held that "*Farmer v. Brennan*'s subjective standard properly governs deliberate-indifference cases brought under the Fourteenth Amendment." *Poynter v. Shirley*, --- F.4th ---, 2026 WL 2641092, at *16 (6th Cir. Sept. 8, 2026) (*en banc*). The parties agree that the Sixth Circuit's recent ruling in *Poynter* controls here and requires the Court to consider the merits of Plaintiff's deliberate indifference claim under the *Farmer* standard.

Based on *Poynter* and the Sixth Circuit caselaw applying *Farmer* before *Brawner*, the Court holds that genuine disputes of material fact remain over Plaintiff's Fourteenth Amendment deliberate indifference claim. As to the objective element, taking a view of the evidence in a light most favorable to Plaintiff, a reasonable jury could find that Plaintiff suffered from a serious medical condition. A plaintiff can show a serious medical need in two ways, either that a physician has diagnosed the condition as mandating treatment, or that the condition "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griswold v. Trinity Health Mich.*, 175 F.4th 706, 711–12 (6th Cir. 2026).

Here, Plaintiff has shown that he suffered from a series of fractures in his hand and that by the time Defendant had transported him to the jail, Plaintiff was experiencing pain and swelling in the wrist where the fractures had occurred. Defendant had also observed a series of bleeding cuts on Plaintiff's body at the time of the arrest. This is enough to meet the objective test. *Gray v. Dorning*, No. 99-5212, 1999 WL 1336118, at *1 (6th Cir. Dec. 20, 1999) ("A reasonable physician or lay person would have recognized the need for prompt treatment after Gray fell out of a top bunk and asserted that he had suffered a fracture and was in pain."); *Turner v. Madison Cnty.*, No. 18-cv-1151-JDT-cgc, 2019 WL 5269104, at *2 (W.D. Tenn. Oct. 17, 2019) (assuming without deciding that a fracture in the hand met the objective test as a serious medical condition); *McCray v. Al-Saeedi*, No. 14-12975, 2015 WL 13741899, at *4 (E.D. Mich. July 31, 2015) (same).

Moreover, a reasonable jury could find that Plaintiff has proven the subjective element of his deliberate indifference claim. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Viewed in a light most

favorable to Plaintiff, a reasonable jury could find in Plaintiff's favor on this point. There is a circumstantial case Defendant subjectively perceived facts from which to infer substantial risk to Plaintiff and that he did in fact draw the inference.

Almost from the start of the traffic stop, Defendant knew that Plaintiff had injuries. Defendant admits for purposes of Rule 56 that at the time of the stop and arrest, he knew Plaintiff had suffered apparent injuries related to a recent fall. (Pl.'s SOF ¶ 22.) The first observable injuries were arguably minor and likely could not have suggested the possibility of broken bones. Defendant saw only scrapes and cuts and noticed Plaintiff was still bleeding. To his credit Defendant repeatedly inquired about the nature of the injuries and received assurances from Plaintiff that Plaintiff was okay. Defendant argues that his repeated inquiries about Plaintiff's well being shows that he was not deliberately indifferent to Plaintiff's medical needs.

But the story does not end there. Defendant received more information about the extent of Plaintiff's injuries once Defendant put Plaintiff in handcuffs. Over the next 46 minutes, Plaintiff repeatedly told Defendant the handcuffs were too tight on his wrists and connected the pain to the falling injury he had sustained earlier. For example, ten minutes after making his first complaint of pain and asking Defendant to check the handcuffs, Plaintiff again asked Defendant to "loosen" the handcuffs and remarked, "I mean, I just fell, you know, so now I'm hurtin." (Def.'s SOF ¶ 11; Video at 00:39:17-00:39:25.) What is more, by the time Defendant had transported Plaintiff to the jail, Plaintiff's wrist had swollen to such an extent that a sheriff's deputy at the jail could see the swelling and pointed it out to Defendant. At that point Plaintiff even stated he needed to go to a hospital because he thought his wrist was broken or fractured. (Video at 1:03:26.) A reasonable jury could find from the proof that Defendant perceived the facts from which he could infer substantial risk to Plaintiff and that he did in fact draw the inference.

A reasonable juror could further find that Defendant disregarded the risk to Plaintiff. Defendant admits that he and he alone had the authority to request medical treatment for Plaintiff and that he did not do so. (Pl.'s SOF ¶ 33.) Plaintiff continued to be in Defendant's custody at the time Plaintiff made his comments about his need for treatment. Rather than call for medical evaluation or treatment, Defendant admits he went about completing his paperwork to have Plaintiff booked into the jail. All of this proof, when viewed in a light most favorable to Plaintiff, tends to show that Defendant disregarded Plaintiff's serious medical need and the risks of not providing Plaintiff with needed care sooner. Defendant's Motion for Summary Judgment on his qualified immunity on this claim must be denied for this reason alone.

**B. Plaintiff's Fourteenth Amendment Rights Were Clearly Established**

Defendant also argues that he is entitled to qualified immunity on Plaintiff's deliberate indifference claim because the specific contours of the right were not clearly established at the time of the alleged violation. For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Defendant argues in his supplemental brief that in the aftermath of *Brawner*, the deliberate indifference standard remained unsettled at the time of Plaintiff's arrest in 2024. Defendant highlights language from the *en banc* decision in *Poynter* in which the majority noted a line of "dueling unanimous decisions reflective of our uncertainty over *Brawner*'s meaning." Def.'s Supp. Br. 6 (quoting *Poynter*, 2026 WL 2641092, at **10–11). In Defendant's view, if the members of the Sixth Circuit could not agree on the correct way to apply *Brawner*, then the constitutional right was not clearly established.

The Court finds Defendant's argument unconvincing for several reasons. First and

foremost, the Sixth Circuit has held in the context of § 1983 and the qualified immunity analysis that a constitutional right may be clearly established even if courts have not yet "agreed upon the precise formulation of the [applicable legal] standard." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 202–03 (2001)). "Rather, the relevant question under the clearly established prong is whether defendants had notice that their conduct was unlawful in the situation they confronted." *Hopper v. Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (quoting *Katz*, 533 U.S. at 202) (cleaned up). The fact then that the Sixth Circuit announced a different test in 2021 for deliberate indifference claims (and then returned to the former test in 2026) does not mean Plaintiff's Fourteenth Amendment right to be free from deliberate indifference to his serious medical needs was not clearly established in 2024.

To the extent that the change in the legal standard for deliberate indifference matters, Defendant's point is also somewhat at odds with his argument that the Court should follow *Poynter*. Defendant argues in his supplemental brief (and Plaintiff concedes the point) that the Court must apply the *Farmer* standard to decide whether Defendant's conduct amounted to deliberate indifference. If *Farmer* provides the correct legal test to evaluate Plaintiff's Fourteenth Amendment claim, then a line of cases rejecting the *Farmer* standard (*Brawner* et al.) would have shed little light on the contours of the pretrial detainee's right to be free from deliberate indifference under *Farmer*. The fact then that the Sixth Circuit's published caselaw on the deliberate indifference standard after *Brawner* may or may not have produced consistent holdings does not answer the question of whether Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly established.

And Defendant does not argue that the Sixth Circuit's decision in *Poynter* reverting back to the *Farmer* standard somehow means that a reasonable officer in Defendant's position could

not have known what the Fourteenth Amendment required in the circumstances confronted by Defendant in 2024. If anything, *Farmer*'s subjective element for deliberate indifference sets the bar even higher than the reasonable officer standard adopted in *Brawner*. *Overstreet v. Ontonagon Cnty., Mich.*, 175 F.4th 680, 686 (6th Cir. 2026) (describing *Farmer*'s deliberate indifference test as "more demanding" and the *Brawner* standard as the "more lenient test for pretrial detainees"). In other words, Plaintiff's case against Defendant for deliberate indifference is arguably now harder to prove than it was before *Poynter*. None of this shows why Plaintiff's right to be free from deliberate indifference to his serious medical needs as a pretrial detainee was not clearly established in 2024. The Court concludes that Defendant is not entitled to summary judgment on his qualified immunity defense. Therefore, Defendant's Motion is **DENIED** as to Plaintiff's Fourteenth Amendment claim for deliberate indifference to a serious medical need.

## CONCLUSION

Genuine disputes of material fact remain for trial over whether Defendant violated Plaintiff's Fourth Amendment right to be free from being handcuffed too tightly or Plaintiff's Fourteenth Amendment right to be free from deliberate indifference to his serious medical needs as pretrial detainee. Therefore, each side's Motion for Summary Judgment must be **DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: November 17, 2026.